UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


STEPHEN MARSHALL GABARICK AND        CIVIL ACTION
BERNARD ATTRIDGE
On Behalf of Themselves and          NO. 08-4007 c/w 08-4156
All Others Similarly Situated        REF: 08-4023, 08-4046
                                          08-4261, 08-4600


VERSUS

LAURIN MARITIME (AMERICA), INC.;     SECTION: "B"(4)
WHITEFIN SHIPPING CO., LTD.;
D.R.D. TOWING COMPANY, LLC;
AMERICAN COMMERCIAL LINES, INC.;
and THE NEW ORLEANS-BATON ROUGE
STEAMSHIP PILOTS ASSOCIATION


## OPINION


    This litigation involves complicated fact pattens and interwoven legal issues.  It begins with a series of vessel chartering agreements by American Commercial Lines, Inc. ("ACL") and D.R.D. Towing Company, LLC ("DRD") - an arrangement described by ACL as a "two step, two contract process".  Record Document Number 1381, p. 55.  The pertinent arrangement involves charter for the M/V MEL OLIVER ("MEL OLIVER").  In another vein, we are presented with numerous contracting and operational arrangements involving Whitefin Shipping Co., Ltd., Laurin Maritime AB, Laurin Maritime (America) Inc., Anglo-Atlantic Steamship Limited, and the

M/V TINTOMARA ("TINTOMARA" interests).  Record Document Number 1383, pp. 38-43.  The collision between the ACL owned barge DM-932, under tow by the MEL OLIVER, with the M/V TINTOMARA resulted in the sinking of that fuel oil laden barge, damages to the TINTOMARA, and various other claims between aforementioned parties, the tugs crew and third parties.  Prior to this vessel limitations trial, collateral federal criminal proceedings were filed against the tug operator and owner/managers of the tug,  which resulted in convictions by guilty pleas from those parties.  Administrative proceedings were also held pursuant to Coast Guard and Oil Pollution Act regulations.

In its two-step with DRD, ACL contracted its tug PAM D, later substituted with the MEL OLIVER, to DRD for a specified time period.  DRD paid a charter rate for the vessel of $1.00 per day provided the vessel was, in the second step, simultaneously chartered back to ACL by DRD to work exclusively in ACL's service at a higher daily or market based rate. Jim Masters, T.Tr. Vol. IX (AM), pp. 32-37, D. Dantin T.Tr.  Vol. VI (AM), p. 103; Exhs. 700-702, inclusive.  Because of a shortage of licensed personnel to operate its tugs and to achieve economics savings, ACL contracted with DRD to operate ACL owned tugs - including the PAM D and the substituted MEL OLIVER.  Sellers, T. Tr. Vol. VII (AM), p. 105;

-2-

Christy, T.Tr. Vol. VII (PM), p. 39; Tr. Exh. 702. This two-step produced a pair of ACL drafted documents entitled "Bareboat Charter", Exhibit 252, and "Fully Found Charter", Exhibit 253. See also, D. Dantin T.Tr. Vol. XI (AM), pp. 101-02; Tr. Exhs. 700, 701 and 702.

Bareboat charters are created when "the owner of the vessel completely and exclusively relinquish[es] possession, command, and navigation" of the vessel to another, called the demisee or charterer. *Guzman v. Pichitilo*, 369 U.S. 698, 699-700 (1962). Courts are to "look through the form of the transaction to its substance to determine whether an agreement for the use of a vessel constitutes a bareboat charter or some other relationship". *Loose v. Offshore Nav., Ins.*, 670 F. 2d 493, 498 n. 8 (5th Cir. 1982). While standing in the shoes of the vessel owner, a "bareboat charterer is responsible for managing and maintaining the vessel, with the vessel owner merely retaining a right of reversion." *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F. 2d 776, 783 (5th Cir. 1986).

The subject bareboat charter required DRD to comply with all laws and regulations with respect to licensing, use, manning, maintenance and operations of the vessels and procure all registrations, certificates and permits for operational purposes. The bareboat charter's exhibit A sets forth how the parties were to

-3-

allocate certain costs based upon the age or number of hours on a piece of equipment. While the bareboat charter contained a provision as to where repairs were to be undertaken, ACL in practice allowed DRD to select the repair yard. The two charter agreements had a three year duration period with a one year option, subject to a 30-day written notice in advance of termination. Exhs. 700-01. DRD had to provide vessel hull insurance, bear risk of loss of the vessel, waive its right to limitation of liability and treat and maintain the vessel as if it were owned by DRD. R. Dantin Depo. p. 49; Carner, T.Tr. II (PM), p. 173.

Simultaneously with execution of the bareboat charter, DRD executed the document entitled "Fully Found Charter", also known as the time charter. The time charter required DRD, by virtue of its position as bareboat charterer, to charter the vessel back to ACL for a particular time period, noted earlier, with performance standards and operating responsibilities, Exhs. B & C to the "Fully Found Charter", Exhibit 701. The incorporated standards called for DRD to crew the vessel with a properly licensed and trained wheelman and a properly trained deckhand per each 12-hour watch, with vessel operations to be on a 24-hour, 365 day schedule. Daily logs of vessel activities were prepared by DRD and transmitted to ACL. DRD was also required to maintain the vessel, including its navigational equipment, prepare reports of incidents involving the

-4-

vessel and its equipment, fully store the vessel for cleaning and crew consumables, supply all engine room consumables, make all repairs other than underwater, provide for crew travel and training, and twice annual 100 Point Inspections. As in the bareboat charter, the time charter contains language that the members of the crew are employees of DRD, with no responsibility by ACL over the vessel crews. Tr. Exhibits 700, p. 5 and 701, p. 7, respectively. Unless noted otherwise, it bears repeating that references to "vessel", "tug" and "crew" pertain to the MEL OLIVER, which, again, served as the temporary replacement vessel for the PAM D - with all terms and conditions unchanged and in effect according to the PAM D's two step charter documents and letter addendums. Tr. Exh. 702, Vol. 12.

To rebut DRD's status as owner *pro hac vice* and establish that ACL maintained operational control over the vessel and crew, the TINTOMARA interests point to evidence that ACL "offered" instructions on how to tie up vessels at certain facilities and other vessel instructions (Rec. Doc. 1380, p. 40, Tr. Exh. 203; Sellers, T.Tr. Vol. VII, pp. 24-29); paid for fuel and lube (noted earlier); "offered" specific safety directives as to the type of personal protective gear (life vests) to be used by crews in ACL's Harahan fleet of vessels (Rec. Doc. 1380, p. 40; D. Dantin, T.Tr. Vol. VI, pp. 17 and 127; Exhs. 130 and 206); could "request" DRD to

remove DRD crew from ACL vessels (Rec. Doc. 1380, pp 40-41; D. Dantin, T.Tr. Vol. VI, p. 126; Sikor, T.Tr. Vol. VIII, p. 91); approved major repair work, location for that work and maintained all electronics on the vessels (Jenkins, T.Tr. Vol. VI, pp. 60-64; Exh. 252; pp. 6-7; D. Danti, T.Tr. Vol. VI, p. 116; Warner depo., p. 24); required DRD principal owners to be part of ACL's hurricane preparedness program (Munoz, T.Tr. Vol. IX, pp. 63-66); directed DRD to retain or paint ACL's logo on the vessel (D. Dantin, T.Tr. Vol. VI, p. 127); could terminate the charters with DRD unilaterally (D. Dantin, T.Tr. Vol. VI, p. 109; Whitlock depo., p. 54-65); and ACL did not allow DRD to earn a profit or freight without ACL's permission (Tr. Exhs. 252, p. 7, 253, pp. 5, 6, 7 and 12; D. Dantin, T. Tr. Vol. III, pp. 124-125).

The docking instructions were merely instructions that ACL received from its customers that were in turn transmitted by ACL to DRD operated vessels.  Tr. Exh. 203.  Even if the docking facilities were owned by ACL, simply directing the manner in which it wanted vessels to tie up to its facilities would not, standing alone, destroy DRD's responsibilities for vessel navigation and management.  To hold otherwise would lead to absurd results in the maritime industry.  Similarly, the conduct of ACL in dispatching information to DRD about where to pick up and transport barges fails to invalidate the subject chartering arrangements or

establish vessel operational control by ACL.  DRD contracted with ACL to perform towing operations of ACL's barges.  ACL needed DRD's towing services in order to satisfy the transportation needs of ACL's customers.  Credible evidence establishes that dispatching DRD to perform those services for the benefit of ACL and its customers did not take operational control of the tugs away from DRD.  D. Dantin, T.Tr. Vol. VI, pp. 6-7; R. Dantin, depo., pp. 39-40; Corner, T.Tr. Vol. II, pp. 15-3-154; Sellers, T.Tr. Vol. VII, p. 80; Christy, T.Tr. Vol. VII, pp. 86-87.  The act of dispatching DRD to a locality was done in ACL's capacity as time charterer, with DRD personnel commanding, navigating and performing the dispatched assignment as owner *pro hac vice* of the tug under the bareboat and time charters.  See in comparison, *Torch, Inc. v. Alesich*, 148 F. 3d 424, 426; and *Etheridge v. Sub Sea International, Inc.*, 806 F. Supp. 598, 601-603 (EDLA 1992).

Payment of fuel and lube oil by ACL also fails to invalidate the charters.  There is no legal authority to support claims that such payments equate to operational control of a vessel, certainly not at the level contemplated to nullify the instant charter arrangements.  The offered safety directives to use a certain life vest, the ability to approve major repairs, participation in a hurricane preparedness plan, and the ability to request removal of problematic crew members from its property are facially reasonable in nature and, again, neither violative of the charters nor

-7-

materially determinative of ultimate vessel control.  Absent credible and admissible evidence otherwise, we interpret the bareboat charter to allow DRD and others to paint their own logos on ACL owned vessels assigned to them, provided that upon redelivery of the vessels (coming off charter) the bareboat charterers were required to repaint such vessels with ACL's logo. Tr. Exh. 700, p.3; Christy, T.Tr. Vol. VII, p. 91; Dantin, T.Tr. Vol. VI, p. 12.  The charter arrangements also allowed DRD to earn a profit within the contracted-for daily charter hire rate for towing and fleeting services, including hiring extra crew if requested for an additional charge.  Tr. Exh. 701, Exhs. A, B & C; Tr. Exh. 702; Dantin, T.Tr. Col. VI, pp. 24-25.  Credible evidence also shows that termination of the charters occurred without objection from DRD as a result of the sued-upon collision. Whitlock depo., p. 63-65; D. Dantin, T.Tr. Vol. VI, pp. 109-110. As seen later along with TINTOMARA'S acknowledgment of DRD's operative negligence, substantial good cause existed for cancelling the charters, with no reasonable hope or expectation for corrective measures by DRD.

Taken singularly or in combination, the limited conditions or restrictions shown above do not divest DRD of its owner *pro hac vice* status and its operational control of the vessel.  Compare *Etheridge v. Sub Sea International, Inc.*, 806 F. Supp. 598 (EDLA 1992) and *Walker, et al v. Braus, et al*, 995 F. 2d 77 (5th Cir.

1993).  Similar to Judge Feldman in *Etheridge*, we were "tempted" to assign the term "operational control" a more expansive and perhaps realistic meaning - one that shows ACL's constructive control in directing the captain where to take the vessel, the reason for the assigned voyage, and ultimately the dedicated purpose of the mission - ACL's economic gain.  Without any of that, DRD would not have the benefit of a viable towage to operate.  However, the facts and law, *sub judice*, do not allow for a more expansive viewpoint at this juncture.

As owner *pro hac vice* of the MEL OLIVER, DRD is responsible for navigation errors by its crew and seaworthiness of the vessel. *See Continental Oil Co. v. Bonanza Corp.*, 706 F. 2d 1365, 1372 (5th Cir. 1983); *Moore v. Phillips Petroleum, Co.*, 912 F. 2d 789, 792 (5th Cir. 1990); *Mallard v. Aluminum Co., of Canada,* 634 F. 2d 236, 242 n. 5 (5th Cir. 1981).  The charter arrangements as intended by ACL and DRD along with their noted operative conduct effectively support the foregoing conclusion.

TINTOMARA interests correctly points out that the mere surrender of control of a vessel does not, *per se*, absolve the vessel's owners.  Rec. Doc. 1380 p. 45.  However, as noted in the same authority for that statement, "If a shield is possible, it can be provided only by a valid bareboat charter."  Quoting Judge Rubin's opinion in *Baker v. Raymond International*, Inc., 656 F. 2d

173, 182 (5th Cir. 1981).  For earlier stated reasons, there was a valid bareboat charter that invested DRD with ownership *pro hac vice* along with a valid time charter that recognized DRD's status as "owner" vis-a-vis ACL's charterer position in the latter charter.

Notwithstanding above findings, ACL's liability could be premised upon proof that ACL knowingly placed an unsafe vessel into the hands of unsafe vessel operators and that such placement caused this collision.  *See China Union Lines, Ltd. v. A.O. Anderson & Co.*, 364 F. 2d 769, 787 (5th Cir. 1966), *cert. denied*, 386 U.S. 933; *Matter of Oil Spill by the Amoco Cadiz*, 954 F. 2d 1279 (7th Cir. 1992).  It is also well established that a principal is not liable for the activities of an independent contractor committed in the course of performing its duties under a contract, unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's action.  *Landry v. Huthnance Drilling Co.*, 889 F. 2d 1469 (5th Cir. 1989).  The principal also remains liable for its own acts of negligence. *Ellis v. Chevron U.S.A.*, Inc., 650 F. 2d 94, 97 (5th Cir. 1981). While most cases of note involving principal liability claims arise in connection with personal injury claims by seaman and offshore platform workers, the same policies recited above generally applies in this maritime vessel collision case.  *Barbetta v. S/S Bermuda*

-10-

*Star*, 848 F. 2d 1364, 1372 (5th Cir. 1988); *In re Central Gulf Lines, Inc.*, 176 F. Supp. 2d 599 (EDLA 2001).

Credible evidence shows that prior to the subject charter with DRD, ACL had no record of any 100 point inspection of the MEL OLIVER for more than two years prior to the instant collision. White, T. Tr. Vol. VIII (PM), p. 77-78. Overall, that tug was described as being in poor condition, very nasty, a mess and in need of various corrections. White, *id.* at p. 67; Jenkins, T. Tr. Vol. VI (AM) , p. 65; Tr, Exh. 228. Specifically, DRD's monthly vessel inspection check list dated July 9, 2009 - 15 days prior to the collision-noted "some slack" in the steering systems linkage, rods, bearing, etc; "engine room need cleaning...boat is in poor condition (and) need to get with Michael White" (ACL's Superintendent of Boat Maintenance). Tr. Exh. 228. Other needs and observations are noted on the DRD checklist, but none appear to be pertinent causative factors in this casualty, i.e. vessel in need of painting, main engines needed some hoses replaced, some slack in the main engines throttle actuators, etc. TINTOMARA interests also refer to ACL's failure to obtain and discover deficiencies in DRD's operating manual from a February 2008 audit and non-conforming industry standards from audits of five vessels by the American Waterways Operators ("AWO") Responsible Carrier Program ("RCP"). Hawkins, T.Tr. Vol. VIII (AM), pp. 12-14; Tr. Exhs. 286-1 and 286-66. ACL expected DRD to be certified by the

latter program, a national trade association that provides the tug and barge industry with various resources, including safety inspections by certified auditors. Dougherty depo., p. 25; Tr. Ex. 289.   In addition to deficiency in DRD's operations manual, the AWO/RCP audit report of April 10, 2008 found five DRD tugs in ACL's Harahan fleet to be in poor condition.   Hawkins, T. Tr. Vol. VIII (AM), p. 28; Clinton depo., pp. 3, 30, 42-43; Tr. Exh. 286-4. According to an April 15, 2008 AWO/RCP audit report those five DRD vessels were: M/V DANIEL, SR., M/V DEMI D, M/V ODILE D, M/V CAROL D and the M/V ANGELICIA D. Tr. Exh. 286-6-9.  A partial listing of non-conformities included the following items that appeared common on all inspected vessels: no operating procedures  posted, no navigational charts for area of operation, no current local notice to mariners, standing fuel in containment area, standing water on equipment,  and  no  evidence  of  safety  drills  or  meetings. Particular problems were noted on the following vessels: flammables stored under wheelhouse on the M/V ODILE D; fuel headers holding fuel and dirty oil pads on the M/V ANGELICA D; used filters and substantial oil/water in bilges, and panel in wheelhouse blocked with "all kinds of junk" on the M/V CAROL D; plastic holding tank on 2nd deck full of slop oil on the M/V CAROL D; and overloaded circuits in the wheelhouse on the M/V CAROL D.  *Id*. The M/V MEL OLIVER was not inspected by the AWO/RCP auditors.

Prior to taking possession of the M/V MEL OLIVER on June 19,

2008, that tug was idle and in dry dock since its last charters to McKinney Salvage Company from June 2006 to June 2007. Prior to the McKinney charter, the MEL OLIVER was chartered to Versatility Marine for about a year and a half. ACL points out that maintenance and repairs on the MEL OLIVER were conducted by McKinney and Versatility during charters with those entities, without any reports of mechanical problems. Christy, T.Tr. Vol. VII, (PM), p. 74. Between June 2007 and June 2008, while the vessel was idle, ACL performed no inspections or repairs. Christy, T.Tr. Vol. VII, (PM), pp. 72-75; White, T.Tr. Vol. VIII, (PM), pp. 48-49, 75-76.

When DRD selected the M/V MEL OLIVER as a temporary loaner vessel it was surveyed on June 16, 2008 before execution of the charter agreements between ACL and DRD. Beebe, T.Tr. Vol. VI (PM), pp. 51-53, 89; Tr. Exh. 705. DRD's safety supervisor attended the survey. Beebe, *Id.*, at pp. 53, 89. The surveyor noted an inability to try out any of vessel's machinery or conduct sea trials because the vessel was in dry dock undergoing repairs or renewals to rudders, steering rams and other equipment. Tr. Exh. 705-0002-0003. The surveyor commented that the vessel appears to be in average condition considering its age and service. He further noted that the vessel's machinery space and equipment, including steering system, were considered well maintained and in satisfactory condition. Finally, he stated the vessel "appears to

-13-

be suitable for its intended purpose, the movement of cargo on the inland rivers and coastwise." Tr. Exh. 705-0017. Surveyor's photographs of the vessel can be found at Tr. Exh. 705-00019 thru 00030. Notably, DRD's safety supervisor and the surveyor deny seeing any problems in the void space under the wheelhouse or any clutter that might come into contact with the vessel's steering system. Beebe, T.Tr. Vol. V (PM), pp. 54-57; Chiasson, T. Tr. Vol. VII (PM), pp. 14-22. The safety supervisor and DRD's head mechanic expressed cosmetic problems with paint and cleanliness, but indicated the vessel appeared to be mechanically sound. *Id.,* at pp. 14-15; Jenkins, T.Tr. Vol. VI (AM), pp. 47-48, 86-87. DRD's assigned captain of the vessel also inspected it on June 19, 2008 and found no impediments to steerage or safe navigation. Carver, Vol. II (PM), pp. 135, 167-175.

     DRD's head mechanic also performed a monthly inspection of the M/V MEL OLIVER on July 9, 2008 and found no problems that could have impeded safe steerage or navigation. He did note the vessel's poor cosmetic condition and some slack in the steering. However, neither he nor the vessel's crew even mentioned any need for repairing the slack condition. Jenkins, T.Tr. Vol. VI (AM), pp. 64-65, 85-87; Tr. Exh. 240. Twice daily inspections of the vessel were to be held in connection with crew changes. DRD was tasked to report and repair leaks or problems with the steering system. There was no evidence of steering linkage blockage before the

-14-

accident.  Jenkins, T.Tr. Vol. VI (AM), pp. 88-89; Sellers, T.Tr. Vol. VII (AM), pp. 61-62.  Specifically, for about a five week period that DRD operated the M/V MEL OLIVER, there were no reported problems with its mechanical, steering, electrical, or radar systems.  Carver, T.Tr. Vol. II (PM), pp. 160-61; Bavaret, T.Tr. Vol. I (PM), pp. 117, 121-122.

The evidence of clutter or loose debris in the void space at best suggests the possibility that something could have come into contact with the steering rams/blocks, causing a blockage that immobilized steering controls.  DRD's Bavaret testified that prior to the collision he was in control of the M/V MEL OLIVER, heading upriver, holding close to the eastbank in order maintain usage of that area's minimal river current.  He explained that the vessel was pushing the barge DM-932 backwards, with the barge's box stern facing forward.  That configuration increased resistance through the water and tended to cause the tow to swerve.  Bavaret, T. Tr. Vol. I (PM), p. 61, pp. 70-71; Carver, T.Tr. Vol. II (PM), p. 162. Bavaret stated the vessel's electric winches overloaded the electrical system, causing a shut down of the radar system.  While attempting to restart the radar system, the vessel and tow turned left.  Upon realizing this Bavaret attempted to turn the vessel but, according to him, the steering jammed.  Bavaret, T. Tr. Vol. I (PM), pp. 88-90.  The vessel and tow at that point was in crossing pattern, heading away from the eastbank towards the

-15-

westbank of the river and increasing speed as it neared the M/V TINTOMARA, which was proceeding downriver and favoring the westbank side of the river channel, Tr. Exh. 298; Bavaret, T. Tr. Vol. I (PM), pp. 91-92.  As the tug and tow began crossing, Bavaret says he heard radio transmissions directed to the MEL OLIVER from TINTOMARA'S pilot.  Bavaret, T. Tr. Vol. I (PM), p. 87.  Bavaret says he saw  TINTOMARA'S red side light and knew it was his duty to keep clear.  *Id.*, p. 88.  Despite the foregoing acknowledgements, Bavaret failed to respond to several radio calls from the TINTOMARA and the Coast Guard Vessel Traffic Controller.  Tr. Exh. 498 – 0004-5, pp. 15-17.

    We find no credible evidence that the MEL OLIVER'S steering system malfunctioned or became immobilized by unstored/loose items. In addition to credible evidence cited earlier, about satisfactory operation during DRD's possession, there is undisputed evidence that the tug's steerage and radar worked satisfactorily immediately after the collision with the TINTOMARA.  Pettigrew, T.Tr. Vol. V (AM), pp. 10-11,; Chaisson, T.Tr. Vol. VII, (PM), pp. 25-27; Dolan, T.Tr. Vol. V (PM), 100-09; James, T.Tr. Vol. II (AM), p. 51; Berthelot, T.Tr. Vol. VI (AM), pp. 29-30.  Even if a malfunction in steering occurred, no reported condition on the MEL OLIVER prevented its operator from reducing the tug's engine speed, reversing all propellers, twin screwing (reversing direction of one propeller's rotation while the other propeller rotates in the

-16-

opposition direction, causing the vessel to veer to port or starboard), or responding to calls from the TINTOMARA and Coast Guard to alert them and other river traffic to his alleged steering problem. Any of those reasonable and available corrective measures would have prevented this collision. Strong, T.Tr. Vol. IV (PM), pp. 35-36.

Privity and knowledge are deemed to exist where the owners had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection. *China Union Lines, Ltd. v. A.O. Anderson & Co.,* 364 F.2d 769, 787 (5th Cir. 1966), *cert. denied*, 386 U.S. 933 (1967). Negligent failure to discover constitutes priority and knowledge within the meaning of limitation statute. *In re Oil Spill by the Amoco Cadiz*, 954 F. 2d 1279, 1303 (7th Cir. 1992). There is a duty to inquire about conditions and practices likely to produce or contribute to loss, unless appropriate means are adopted and adhered to in order to prevent loss. *Avera v. Florida Towing Corp.*, 322 F. 2d 155, 166. (5th Cir. 1963).

DRD management knew that Bavaret, an unlicensed steersman, had been fired twice by DRD before this collision for sleeping while either on watch or at the control of a DRD vessel. Carver, T.Tr. Vol. II (PM), pp. 19-20, 114-120, 164-167. DRD management even overruled the M/V PAM D's captain's decision to remove Bavaret from that vessel for sleeping while on watch. Bavaret stated he was

asleep while on watch aboard the M/V PAM D because of the influence of a legal drug.  Bavaret, T.Tr. Vol. I (PM) p. 148.  Immediately after the instant collision, a crew member on the MEL OLIVER found Bavaret slumped over the steering sticks and non-responsive. Pettigrew, T.Tr. Vol. V (AM), pp. 10-14; see also Chiasson, T.Tr. Vol. VIII (AM), p. 81. DRD's principal managers engaged in the practice of using unlicensed crew members aboard its vessels at the time of and prior to this collision.  Sellers, T.Tr. Vol. VII (AM), pp. 36, 38, 76 and 77.  DRD's principal managers also knew a few months prior to this collision that its vessels were being operated by crew members in excess of 12 working hours, in violation of Coast Guard safety regulations.  Indeed, the same master assigned to the MEL OLIVER was acknowledged by DRD to have been working excessive hours aboard the M/V PAM D at time of that tug's collision with another vessel. Tr. Exhb. 23; Carver, T.Tr. Vol. II (AM), pp. 125-126. By all of above known acts of misconduct by its employees, DRD created an environment that was obviously conducive to repetitive safety violations by its employees, especially the captain and steersman of the MEL OLIVER whose previous acts of misconduct were well-known and condoned by DRD.  Irrefutable credible evidence well-establishes that the combined misdeeds of that captain and steersman caused this collision.

The foregoing evidence of DRD's privity and knowledge is further corroborated by pleas of guilty to federal crimes by DRD

and its co-owner and operations manager, Randall Dantin. In connection with their respective guilty pleas, both DRD and Randall Dantin acknowledged that their criminal misconduct arose from the instant collision and their use of unqualified and improperly licensed individuals in critical positions onboard DRD vessels and from a practice which allowed DRD employees to operate its vessels for more than 12 hours in a 24 hour period without relief. Tr. Exh. 254 (DRD's Factual Basis for Guilty Plea); Record Document 1015-1; EDLA Cr. Action No. 10-190 "B", Record Documents 1 and 23 (Bill of Information and Factual Basis for R. Dantin Guilty Plea - Judicially Noticed); EDLA Cr. Action No. 10-191 "B", Record Documents 1, 17 and 18 (Bill of Information, Factual Basis and Plea Agreement for DRD Guilty Pleas - Judicially Notice).

While ACL's vetting of DRD's vessel operators for licensing, accident history and compliance with the federal 12 hour watch rule is imperfect and needs improvement, we find credible evidence that ACL acted reasonably in that vetting process, albeit minimally here. As acknowledged by the TINTOMARA interests, ACL discovered that a DRD employee was operating ACL's tug M/V REGINA ANN without a current license. Christy, T.Tr. Vol. VII (PM), pp. 37-40. This discovery was reported to ACL's corporate offices. *Id.*, p. 40 According to another witness he had "little inklings" from unknown others that DRD may have been using unlicensed operators. Sikora, T.Tr. Vol. VII (AM), pp. 120-121. ACL's Vice-President of

Regulatory Compliance testified it would have been poor judgment for an ACL employee with that information in failing to either follow-up on the rumor and report it to ACL management or to shut down operations immediately.  Munoz, T.Tr. Vol. IX (AM), pp. 98-99. Masters, T.Tr. Vol. IX (AM), pp. 42-43.  There is also evidence that DRD operated vessels were involved in 17 accidents between January 2007 and May 2008.  There is also evidence that any accidents involving DRD operation of ACL titled vessels were reviewed in order to determine the need for corrective action. Whitlock Depo., p. 45; Dougherty Depo., p. 26; Sikora, T.Tr. Vol. VIII (AM), pp. 66, 104-017, 110, 117-118; Munoz, T.Tr. Vol. IX (AM), p. 43. None of those reported incidents involved a licensing problem.  Tr. Exhs. 6-23; Dougherty Depo., pp. 53-58; Sikora, T.Tr. Vol. VIII (AM), p. 115.  The auditor from the independent auditing group AWO testified that in connection with the management audit of DRD, including the five vessels noted earlier, he never discovered any evidence that DRD was either using improperly licensed crewmen or having crewmen to violate the 12-hour rule.  Hawkins, Vol. VIII, (AM), p. 51.  There is also credible evidence that ACL auditors also reviewed the licenses of DRD operators.  Sellers, T.Tr. Vol. VII (AM), p. 69-70; Sikora, T.Tr. Vol. VIII (AM), pp. 105-107, 117-118.  Through quarterly meetings with DRD and audits of DRD vessels, ACL never discovered evidence that DRD was either using unlicensed operators or working crews in violation of 12-hour watch

rule. *Id.*, pp. 118-121. It appears that ACL properly responded to the "rumor" incident reported to ACL management. Munoz, T.Tr. Vol. IX (AM), pp. 98-99.

The charter arrangement required ACL to pay DRD for the assignment of two properly licensed DRD captains to each tug. In response to the report that a DRD captain might have an expired license, the vessel was not allowed to leave until two licensed captains were onboard. DRD assured ACL this could never happen again. At the time of this assurance ACL had never before and until the collision reason to believe that DRD management allowed such a practice to occur. Christy, T.Tr. Vol. VII (PM), pp. 39-40, 67-69.

Unbeknownst to ACL and the Coast Guard, DRD concealed in May 2008 that it had assigned only one captain aboard the M/V PAM D at the time of that tug's collision with the M/V LOUISIANA STAR. DRD also concealed that the assigned captain was violating the 12-hour rule at the time of that collision; all with full knowledge of DRD principals. Carver, T.Tr. Vol. II (PM), pp. 125-126. Two months later, that same captain boldly leaves command of the MEL OLIVER into the hands of an unlicensed crew member that he previously tried to fire for sleeping while on watch. As seen earlier, DRD overruled that firing. DRD's exceedingly lax management styles, overly tolerant forgiveness of repetitive safety violations by its crew members and, worst, its intentional concealment of those

violations overwhelming establish its culpability in the subject collision.  TINTOMARA's reliance upon DRD's incident history to inculpate ACL, as described above, is misplaced.  ACL cannot be held accountable for DRD's concealment of information or false reporting on crew licensing, assignments or watch hours.  Four other reported incidents involved damages to ACL barges that were not caused by DRD, three involved "zero dollars" of damage, and the rest involved minor damage reports, except for the PAM D collision discussed earlier. Tr. Exhs. 6-23. Two weeks prior to MEL OLIVER's collision with the TINTOMARA, DRD operated tug M/V RUBY E was under the command of an under-licensed captain when it was struck from behind and sank.  The tug's titled owner Zito was not aware of the licensing issue and DRD was exonerated from any fault in the sinking.  Boudreaux, T.Tr. Vol. I (AM), pp. 13-14, 24.  ACL conferred with DRD about that sinking and was satisfied with the finding that the tug was struck from behind.  DRD never told ACL or Zito that an improperly licensed operator was at the tug's control when it was rear-ended and neither of those entities had reason to suggest a licensing issue existed at the time.  Christy, T.Tr. Vol. VIII (PM), pp. 48-49, 60.  ACL had neither actionable fault for nor forseeability into DRD's misdeeds that caused the collision.

In reaching our findings, we should also note a lack of impression with the evidence presented from Dawicki.  Even if he was hired to improve ACL's vetting program, which is contraverted,

his testimony about that program is largely conclusory and self-ingratiating.  See Tr. Exhs. 423-10 to 423-11; Dawicki, Depo., pp. 19-22; Wilkins, Depo. pp. 9-28.

ACL seeks a liability finding against the TINTOMARA interests that apportions 33% of the fault to that shipping concern.  As basis, ACL points to evidence that the lookout on TINTOMARA's bow was untrained and failed to report anything to the bridge about the MEL OLIVER flotilla before the TINTOMARA's whistle was blown at about the 1:29:00 hour, or 1 minute and 33 seconds prior to the collision.  Gueverra Depo., pp. 37-38.  However, clear evidence from the TINTOMARA's pilot, captain, ACL's own expert and others establish that the bridge was already and timely aware of the flotilla's position prior to and after it became a collision risk.  Bjave, T.Tr. Vol. I (AM) pp. 46-47, 72; Gould, T.Tr. Vol. III (PM), pp 51-52; Strong, T.Tr. Vol. IV (PM), p. 39; (Aware of flotilla at 1:25:46 hours); Bergin, T.Tr. Vol. IV (PM), pp. 108, 109, 111.  ACL fails to establish any casual link between the lookout evidence and the collision.  Compare, *Ellis Towing & Transportation Co. v. Socony Mobile Oil Co.*, 292 F. 2d 91, 96 (5th Cir. 1961) and *Makin v. Empresa Lineas Maritimas Argentinas*, 630 F. Supp. 1168, 1175 (D. Mass. 1986).

Without credible evidence in support, ACL argues TINTOMARA's speed of half-ahead or 14 knots was too fast.  ACL's own expert opined the TINTOMARA should have increased speed in the execution

of a zig-zag maneuver starting with a 35° portside turn to avoid collision.  Randall, T.Tr. Vol. V (AM), pp. 57-58; Tr. Exh. 719-0025.  ACL experts do not fault TINTOMARA's speed.  Bergin, T.Tr. Vol. IV (PM), pp. 85-130; Wilson, T.Tr. Vol. IV (AM), pp. 130-143.  Instead of criticizing TINTOMARA's speed or the speed of the other two ships that were part of its downriver convoy, Coast Guard Vessel Traffic Controller told it to "keep on coming".  Brown, T.Tr. Vol. III (PM), pp. 9, 16; Robling, T.Tr. Vol. III (PM), p. 60; Tr. Exh. 498-0004, p. 15.

Another inconsequential ACL argument relates to non-use of the TINTOMARA's Automated Radar Plotting Aid (ARPA) or Automatic Identification System (AIS).  Credible evidence established that the latter aids in a river environment with many vessels, as here, would have been impractical, distracting and useless tools.  Brown, T.Tr. Vol. III (PM), pp. 7-8; Gould, T.Tr. Vol. III (PM), pp. 47-48; Bjarve, T. Tr. Vol. I (AM), p. 40.  While believing the ARPA is a valuable tool, ACL's expert conceded it is less reliable in a sinuous river.  Bergin, T. Tr. Vol. IV (PM), pp. 112-115.  ARPA would not have provided navigators in this setting with any more useful information than already known for an assessment of risks and avoidance.

Next, ACL cites to Inland Rules of the Road 8, 17 and 34, its simulation exhibit, and testimony calling for the so-called "Z" maneuvers as further basis for a fault finding against the

-24-

TINTOMARA interests. Tr. Exh. 719-0025; Randall, T.Tr. Vol. V (AM) pp. 57-58; Bergin, T.Tr. Vol. IV (PM), pp. 100-101; Wilson, T.Tr. Vol. IV (PM), pp. 137-140, 142. In that connection, ACL begins with criticism of the 10° starboard rudder order given by TINTOMARA's pilot, contending that order was a contributing cause of the collision. Record Document Number 1381, p. 27. Again ACL seems to argue against testimony from its own witness. ACL expert Bergin explicitly testified that:

> I really don't have a problem the 10° to
> starboard. It's almost instinctive when you
> have a crossing situation where you have
> another ship, or tug or barge in this case,
> crossing on your port side from port to
> starboard, ideally you would like to be able
> to go starboard. So I really don't have a
> problem with the initial course change to
> starboard.

Bergin, T.Tr. Vol. IV (PM), p. 102.

Similarly, ACL's expert pilot Wilson did not have serious criticism of the starboard 10° order. ACL also points to evidence that the TINTOMARA's whistle signals might have been inappropriate and confusing. However, ACL's expert Bergin testified that the MEL OLIVER and other vessel operators in the vicinity recognized that TINTOMARA's whistle signals signified danger. Bergin, T.Tr. Vol. IV (PM), pp. 122-123. An even more qualified expert river pilot

testified there could have been confusion but from his review of everyone's statements and materials about whistle signals, there was in reality no confusion by everyone who heard TINTOMARA's whistle blasts.  Strong, T.Tr. Vol. IV (PM), p. 135.  Expert ship captain and pilot Strong also testified the whistle was being sounded continuously, with three short breaks in between.  Strong, T.Tr. Vol. IV (PM), p. 27.   In addition, TINTOMARA's pilot announced his actions on VHF radio to alert everyone to what was being done to avoid the collision.   Tr. Exh. 498-0005, p. 17. TINTOMARA's stop order was neither executed improperly nor untimely under the circumstances.   There was concern among ACL witnesses that a stop order would lead to a loss of vessel control.   It didn't.  Bergin, T.Tr. Vol. IV (PM), pp. 122; Wilson, T.Tr. Vol. IV (PM), pp. 136.   The TINTOMARA's propeller pitch control system takes about 32 seconds to respond to a lever command, with the lever ahead of the pitch response. Bjave, T.Tr. Vol. I (AM) p. 99. While using all practical means to alert the MEL OLIVER of the collision risk and coordinate awareness for collision avoidance, the TINTOMARA's actions were countered by an unexpected rogue tug operations and crew.

ACL correctly notes that the MEL OLIVER flotilla created a crossing situation and was obliged to keep out of the way of the TINTOMARA.   Inland Rule 15; Record Document Number 1381, p. 10. Further, the TINTOMARA as the "starboard - hand" or priviledged

vessel was required to keep her course and speed. Inland Rule 17; Record Document 1381, p. 10.  ACL also correctly states that the Inland Rules do not give the priviledged vessel the right to continue on her course and speed until a collision is unavoidable. In other words, there is never a right of way into collision. *Postal S.S. Corp. v. The El Isleo*, 308 U.S. 378, 386-7 (1940). There "comes a time when the priviledged vessel must yield <u>and the point at best is one of degree</u>". *Id.*, at 386 (Emphasis added).  The essential question here is whether the master of the TINTOMARA could have avoided the collision by the exercise of ordinary care under the circumstances. *The Portia*, 64 F. 811, 814 (2nd Cir. 1894) (Cited by ACL at Record Document 1381, p. 12).  As found in *Sawyer v. McDonald*, 165 F. 2d 426, 429-30 (5th Cir. 1948), fault of the priviledged vessel can probably lay in relying too heavily on priviledge, and in shifting course slightly to starboard <u>without signal</u> in order to make the usual port-to-port passage. (Emphasis added).  Further, there is a duty to stop and reverse as soon as the danger of collision is seen to exist because of doubt as to what the other vessel may do. *The Quogue*, 47 F, 2d 873, 873-4 (2nd Cir. 1931).  This was the action taken by the TINTOMARA.

ACL's computerized solution would require a port side turn at full ahead and then a series of counter turns, the so-called "Z" maneuver noted earlier, at 45 seconds before the collision.

Wilson, T.Tr. Vol. IV (PM), p. 137, 139-140.  In describing how he performed that maneuver before, ACL's expert Mississippi river pilot testified he was not saying that the measures taken by TINTOMARA's operators were unreasonable, but that he thought the "better option would have been at the last possible point to go to the left or to the port."  Wilson, T.Tr. Vol. IV (PM), p. 140.  In fact, it is undisputed that in giving the starboard 10° order, as noted earlier, TINTOMARA's operators did <u>to a degree</u> what ACL's witnesses thought would be a better option.  See also, Wilson, T.Tr. Vol. IV (PM), p. 135.  More credible and independent evidence convinces that TINTOMARA's navigators properly responded to extreme and extraordinary conditions created by the MEL OLIVER. Independent witness Captain Robling testified he would have executed the same back down and stop maneuver that he witnessed being done by the TINTOMARA.  He would have been surprised by a port turn.  Robling, T.Tr. Vol. III (AM), pp. 73-74.  Other credible evidence confirms that execution of a port turn without an agreement with the MEL OLIVER would not be a proper consideration under the circumstances here.  Strong, T.Tr. Vol. IV (PM), p. 109. Lastly, ACL's programed simulation is not reliable.  The program fails to take into consideration all pertinent vessel traffic and other conditions in the proximate vicinity of the involved vessels. For instance, the simulation fails to include the northbound M/V DREAMA KLABER flotilla as other traffic or potential hindrances to

-28-

the "Z" maneuver suggested by ACL. Evidence clearly establishes that the TINTOMARA's operators were well aware of all vessel traffic at all pertinent times. Gould, T.Tr. Vol. III (PM), p. 60-61. In addition to the DREAMA KLABER and MEL OLIVER flotilla on the river's east side, there were the M/V JUDY ANN and the ocean going M/V ARNEBORG. The M/V CROSBY flotilla was on the river's westbank side, downstream of the Harvey Lock Forebay. Upriver from that lock on a westbank wharf were two large U.S. Navy ships abreast of each other. *Id.* As earlier noted, the TINTOMARA was also part of a three ship convoy, heading downriver and spaced about a mile apart from each other. We are unaware of any authority that binds vessel operators to adhere to perfect or, as here, imperfect computer programs in real life emergency situations. To hold otherwise would wrongfully substitute absolute liability rather than negligence principles in assessing whether maritime operators acted prudently under the circumstances. The fact that TINTOMARA's maneuvers were unsuccessful in avoiding collision does not create fault where none existed prior to or after the maneuvers. Compare, *Paterakis v. U.S.*, 849 F. Supp. 1106, 1111 (E.D.VA 1984) Just as there are no perfect humans in life, there are no perfect navigators in the marine industry.

Accordingly, judgment will be entered casting at fault DRD *in personam* and M/V MEL OLIVER *in rem* for the instant collision, oil spill and damages, rejecting DRD's claims for limitation of

liability.   We also reject in its entirety all claims for relief made by John Bavaret for reasons noted above.[1] [2]

New Orleans, Louisiana, this 28th day of September, 2012.

_____
UNITED STATES DISTRICT JUDGE

---

[1]   This finding includes rejection of Bavaret's claims for already paid maintenance and cure.

[2]   As alternative findings, should our findings of no-fault as to the TINTOMARA be overturned, we find entitlement by all TINTOMARA interests to limitation of liability.  All such entities acted together in an integrated fashion to handle all aspects of ownership over the M/V TINTOMARA, with an interchange of personnel and a common executive committee for operational decisions.  Wilson, T.Tr. Vol. VII (PM), pp. 118, 126, 138,.  *In re Shell Oil Company*, 780 F. Supp. 1086 (E.D.LA. 1991); *Petition of United States*, 259 F. 2d 608, 609-10 (3rd Cir. 1958).  Further, as is the case with ACL, there is no credible evidence that either TINTOMARA's or ACL's principals had privity or knowledge of any causative fault for this collision by their employees.