# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

STEPHEN MARSHALL GABARICK, ET AL.   CIVIL ACTION

VERSUS          No. 08-4007
             Consolidated Cases
             Applies to 08-4023,
             08-4046, 08-4156,
LAURIN MARITIME (AMERICA), INC., ET AL. 08-2161, and 08-4600

## ORDER AND REASONS

Before the Court is Laurin Maritime (America) Inc., Laurin Maritime AB, Whitefin Shipping Co. Ltd., and Anglo-Atlantic Steamship Limited's (collectively the "Tintomara Interests") "Motion for Summary Judgment Against National Liability and Fire Insurance Company." (Rec. Doc. 1542). American Commercial Lines LLC ("ACL") and National Liability and Fire Insurance Company ("National Liability") filed a joint opposition thereto, and the Tintomara Interests filed a reply. (Rec. Docs. 1547 & 1556).

Also before the Court is ACL's Motion for Disbursement of Funds from Registry of Court. (Rec. Doc. 1545). The Tintomara Interests have filed opposition thereto, and ACL filed a reply. (Rec. Docs. 1548 & 1558).

**IT IS ORDERED** that the Tintomara Interests' Motion for Summary Judgment is **GRANTED** (Rec. Doc. 1542) and judgment be entered in favor of the same and against National Liability in the amount of

$387,215.41, plus costs and interest.

**IT IS FURTHER ORDERED** that ACL's Motion for Disbursement of Funds (Rec. Doc. 1545) is **DENIED without prejudice to reurge** as an ex parte motion with certification that no other claimants oppose disbursement of the funds it seeks, especially in view of findings, *infra*.

FACTS OF THE CASE AND PROCEDURAL HISTORY:

The facts underlying this consolidated matter are well-known to the Court and the Parties, and they need not be set forth with any detail here.[1] These matters arise out of the July 23, 2008 collision between barge DM-932, which was under tow by the M/V MEL OLIVER, and the M/V TINTOMARA. ACL owned both the MEL OLIVER and barge DM-932, although both were operated by D.R.D. Towing Company, LLC ("DRD") under a demise charter at the time of the collision. The collision split the barge into pieces and released its load, over 300,000 gallons of oil, into the Mississippi River.

That event spawned a number of suits in this Court. Most pertinent here, each of DRD, ACL, and the Tintomara Interests filed limitation actions (*see respectively*, Civil Action Nos. 08-4261, 08-4600, and 08-4023) and, separately, DRD's liability insurers filed an interpleader action, in which they ultimately deposited $9,000,000.00, DRD's policy limit. (*See* Civil Action No. 08-4156).

---

[1]A detailed factual discussion, including the Court's prior findings, may be found in the Court's Opinion issued following a lengthy bench trial. (Rec. Doc. 1435).

Each of these actions was consolidated with the instant matter (Civil Action No. 08-4007, Rec. Docs. 10 & 206; Civil Action No 4600, Rec. Doc. 7).

In November of 2008, the Tintomara Interests filed a verified claim in ACL's consolidated limitation action, seeking judgment against the MEL OLIVER, *in rem*, and against ACL *in personam* for damages incurred by TINTOMARA as a result of the collision. After several years of motion proceedings, settlement of individual claims made in various other cases consolidated with those implicated here,[2] appeals and related litigation, DRD, ACL, and the Tintomara Interests proceeded to trial before the bench on their consolidated limitation actions, and tried their numerous and alternative claims against each other. After trial began in July of 2011, but before closing arguments in September of the same year, ACL and the Tintomara Interests stipulated to their respective damages sought from each other and with respect to claims pending against DRD. (Rec. Doc. 1368). That stipulation was entered into "with the consent and approval of ACL's interested underwriters[,]" and stipulated Tintomara's relevant damages to be $750,000 and ACL's to be $70,000,000. *Id.* After a lengthy bench trial, the Court, by written opinion, found DRD and the MEL OLIVER to be solely at fault for the incident and entered Judgment that "D.R.D. Towing Company, LLC, *in personam* and the M/V MEL OLIVER, *in rem*,

---

[2] See, e.g., Rec. Docs. 1431, 1427, 1426.

are liable to and shall pay . . . [the Tintomara Interests and ACL] . . . their respective stipulated recoverable damages, plus interest and costs, as set forth in" the aforementioned stipulation. (Rec. Docs. No. 1435 at 29-30, 1436). While appeal on such judgment was pending, the Court granted both (i) the Tintomara Interests' motion for disbursement of $750,000 (the amount of their principal damages) (Rec. Doc. 1483), and (ii) ACL's motion for disbursement of $7,100,000 in partial satisfaction of that party's principal damages. (Rec. Doc. 1492). In each instance, the funds were drawn from the $9,000,000 in DRD's insurer-initiated interpleader action. The Court's judgment has since been affirmed in a one-paragraph *per curiam* opinion. (Rec. Doc. 1550).

The Tintomara Interests now seek pre- and post-judgment interests, along with costs, and move for judgment against the letter of undertaking ("LOU") furnished by National Liability in ACL's limitation action in the amount of $387,215.41, an amount comprised of that party's calculations of $266,702.06 in pre-judgment interest, $107,639.91 in costs, $7,388.95 in "post-judgment interest on pre-judgment interest and on the costs," and $5,484.50 in interest incurred after payment was ordered but before it was delivered on the $750,000 principal judgment. (Rec. Doc. 1542 at 2).

Separately, ACL moves for disbursement of what remains in the interpleader action, less $3,401.25 in payment to DRD's counsel, in

further satisfaction of its stipulated damages. (Rec. Doc. 1545).
Both motions are opposed and have been adequately briefed.

CONTENTIONS OF THE TINTOMARA INTERESTS

The Tintomara Interests move this Court to grant summary judgment awarding pre- and post-judgment costs and interests, for which the MEL OLIVER has been held liable *in rem*, by having that judgment enforced against the LOU furnished by ACL's underwriter in ACL's original limitation action, National Liability. (See Rec. Doc. No. 1542-3 at 1). The Tintomara Interests' argument is premised upon the notion that the LOU furnished by National Liability was effectively substituted in the place of the MEL OLIVER as a *res* against which an *in rem* judgment is enforceable to the same extent that such judgment would be enforceable against the vessel itself. The movants characterize an action for limitation of liability in the admiralty context as one premised on both *in personam* and *in rem* liability. Thus, as security furnished in ACL's limitation of liability action, the fact that ACL was exonerated from *in personam* liability is immaterial in light of the residual *in rem* liability of the MEL OLIVER, which was also covered by the LOU as security in that action.

CONTENTIONS OF ACL

For purposes of enforcement of the *in rem* judgment against the LOU, ACL argues that limitation of liability is a personal defense and that the LOU was furnished as security only for successful

claims in ACL's limitation action. Because ACL was exonerated from liability, ACL contends there are no "successful claims" in that limitation action which can be enforced against the LOU, to the extent that it only secures ACL's potential *in personam* liability as owner of the MEL OLIVER. Alternatively, ACL argues that if the *in rem* judgment against the MEL OLIVER is enforceable against National Liability's LOU, then ACL and the Tintomara Interests ought to share a pro-rata distribution of the funds secured by that instrument.

BACKGROUND LAW

The motions before the Court implicate the concept of the personification of the vessel; a legal fiction that has been the subject of legitimate criticism concerning its continued utility in the modern era and in light of the now ubiquitous corporate form.[3] Nevertheless, this concept is fundamental to many aspects of claims sounding in American admiralty law in spite of the ostensible complications it presents in this instance. Further complicating the issues is the procedural mechanism of the limitation action. Fortunately, principles of equity and pragmatism serve to elucidate the proper result here, notwithstanding the somewhat arcane contractual arrangements and admiralty constructs at play.

*The Personification of the Vessel and Bareboat Chartering*

---

[3]

See, e.g., *The Carlotta*, 48 F.2d 110, 112 (2d Cir. 1931) (Judge Learned Hand famously denounced the theory as "archaic . . . an animistic survival from remote times . . . based on irrational fictions . . . atavistic . . . .").

6

Central to the present issue is the concept of the personification of the vessel, whereby a claim may be enforced against a vessel for which the vessel's owner is not liable at the time of suit.[4] This concept is of particular relevance in the contractual context where, as here, the vessel is operated pursuant to a bareboat or demise charter. Under such an agreement, the charterer (here, DRD) takes complete control of the vessel, mans it with its own crew, and is treated by law as its legal owner.[5] This form of charter amounts to the transfer of full possession and control of the vessel for the period covered by the contract. Importantly, the charterer:

> as owner *pro hac vice* is also potentially liable for collision, personal injuries to the master, crew, and third parties, pollution damages, and for loss or damage to the chartered vessel. The owner normally has no personal liability, but the vessel may be liable *in rem*. The charterer, however, has an obligation to indemnify the vessel owner if the damage was incurred through the charterer's negligence or fault.[6]

This result arises by virtue of the fact that a vessel may become

---

[4]

It should be noted that there is no settled consensus on the original justifications for the development of the personification theory. Although intriguing, such a discussion is beyond the scope of this opinion. See, e.g., Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty 594 (2d ed. 1975)(hereinafter, "Gilmore and Black")("Thus, the fiction of the ship's personality, introduced as a literary flourish to explain why ships should occasionally be liable to arrest even though the underlying claims could not be enforced against the owner.").

[5] 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-1 (5th ed 2013)(hereinafter, "Schoenbaum").

[6] Schoenbuam, *supra* note 6, at § 11-4.

encumbered by a maritime lien through the actions of anyone lawfully in possession of the vessel at the time of the casualty.[7]

In this legal framework, instances arise where the fictional cleaving of the identities of vessel and owner for purposes of liability lead to tortured results. When the vessel owner is exonerated from liability but the vessel is held liable *in rem*, the practical consequence is that the owner is still subject to liability to the extent of his or her interest in the vessel, which becomes subject to a judgment enforced against the vessel as an offending thing.[8] In the words of Justice Bradley, "To say that an owner is not liable, but that his vessel is liable, seems to us like talking riddles. A man's liability for a demand against him is measured by the amount of property that may be taken from him to satisfy that demand." *The City of Norwich*, 118 U.S. 468, 503 S.Ct. 1150, 162, 30 L.Ed. 134(1886) (cited in *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed. 1540 (1960)); *accord*, *Consumers Import Co. v. Kabushiki Kawasaki Zosenjo*, 320 U.S. 253-254, 64 S.Ct. 15, 17, 88 L.Ed. 30. Indeed, it is precisely this collapse of the distinction between the liability of the owner

---

[7] See Schoenbaum, *supra* note 6, at § 21-5 (citing *The China*, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1868); *The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901)).

[8]
 See Schoenmbaum, *supra* note 6, at § 21-3("Admiralty's distinctive process *in rem* is within exclusive admiralty jursidiction . . . the warrant for arrest is issued to foreclose and enforce a lien. Although the property arrested is usually a vessel, the warrant can be directed against any property that may be subject to a maritime lien.")

and vessel that lies at the heart of the issue *sub judice*. This fundamental reality is rendered no less a truism by ACL's attempted obfuscation of the issues in the context of an owner's limitation action.

### The Limitation of Liability Action

A full understanding of the issues before the Court also implicates the procedural device of the limitation action.[9] The Limitation of Shipowners' Liability Act creates a procedure whereby the shipowner may limit its liability for claims arising out of a casualty to the value of his interest in the vessel. 46 U.S.C. § 181 et seq.; Fed. R. Civ. P Supp. Rule F. It also provides a single forum for resolving the questions of the liability of the shipowner as well as the merits of competing claims in an action arising out of a particular casualty.[10] Of essential importance to the instant action, "[l]imitation extends both *in personam* to the shipowner as

---

[9]

It should be noted that the continued utility of the limitation act is itself also subject to criticism. See, e.g., Gilmore and Black, *supra* note 5 at 822,("Such an attitude reflects, it is suggested, not so much hostility to the shipping industry as a recognition of the fact that the Limitation Act, passed in the era before the corporation had become the standard form of business organization and before present forms of insurance protection (such as Protection and Indemnity insurance) were available, shows increasing signs of economic obsolescence."); see also, Schoenbaum, *supra* note 6, at § 15-7 ("The application of these rules in some cases produces a fund that is unreasonably low in relation to a casualty, which is a major source of criticism of the entire concept of limitation of liability . . . Under American law the fund value is unpredictable, and the potentially low level of liability cannot be justified either economically or jurisprudentially.")

[10] Schoenbaum, *supra* note 6, at § 15-5.

well as *in rem*" to the ship.[11] A shipowner who anticipates that claims arising out of a casualty might exceed the value of the vessel will file the limitation action, where applicable, either as a defense to a complaint for damages or as an independent complaint in admiralty.[12] As a condition to the filing of the limitation action, the vessel owner must either transfer his interest in the vessel and pending freight to a trustee or deposit with the court the amount or value of his interest in the vessel and pending freight, or approved security therefor.[13] Once the shipowner has complied with the requirements for the limitation action, the Court will stay all proceedings against the owner arising out of the incident in question and set a "monition" period during which all prospective claimants must file their claims in the same concursus action under pain of default.[14]

### *Security Substituted as a Res*

An important aspect of the modern limitation action is the opportunity for the vessel owner to furnish security in lieu of attachment of the vessel itself. Recognizing that general economic efficiency and productivity were best served by returning a ship as

---

[11] *Id.* (citing *Hartford Accident & Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927)).

[12] Schoenbaum, *supra* note 6, at § 15-5.

[13] Fed. R. Civ. P. Supp. Rule F(1); see also Schoenbaum, *supra* note 6, at § 15-5.

[14] *Id.*

promptly as possible to commerce, admiralty courts began to approve various security devices as substitutes for the vessel itself. Under these arrangements "[a]special bond or letter of undertaking effectively replaces the arrested property for purposes of the *in rem* action, allowing the owner to continue to use the property, while providing the plaintiff with security for any judgment it may obtain against the vessel." *El Paso Prod. GOM, Inc. v. Smith*, 406 F. Supp. 2d 671, 674-75 (E.D. La. 2005).[15] It is within the foregoing legal framework that this Court must ascertain the enforceability of the *in rem* judgment in this case.

---

[15]

See also, *Hartford Acc. & Indem. Co. of Hartford v. S. Pac.* Co., 273 U.S. 207, 220, 47 S.Ct. 357, 360, 71 L.Ed. 612 (1927)

It is quite evident from this that the stipulation under rule 54 et seq., is to be treated as a substitute for the vessel itself for all claims that may normally arise out of the character of litigation carried on under such rules. That litigation as we have seen may properly be carried to a complete settlement of all claims, without regard to whether the prayer for limitation of liability is denied or not;

accord, *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1115 (5th Cir. 1985)(Higginbotham, J., dissenting on other grounds):

Admiralty courts have traditionally waived strict adherence to the jurisdictional requirement of arrest, and allowed release of a vessel from custody upon the posting of a bond or stipulation for value. Such a bond confers jurisdiction even in the absence of arrest. . . . *The bond, stipulation for value, or letter of undertaking, then, become jurisdictional substitutes for the vessel itself, the res upon which the court may act. See Continental Grain Company*, 364 U.S. at 38, 80 S.Ct. at 1481 (Whittaker, J., dissenting)("This Court has from an early day consistently held that a bond, given to prevent the arrest or procure the release of the vessel, *is substituted for and stands as the vessel in the custody of the court.*")

(emphasis added).

APPLICATION

Shortly after the 2008 collision that is the subject of the present matter, ACL filed a limitation action in which it disavowed all fault on its own behalf or on behalf of its tug and tow and, alternatively, sought to limit liability of both ACL *in personam* and the MEL OLIVER *in rem* if either entity were found at fault. (Civil Action No. 08-4600, Rec. Doc. 1). In initiating that action, ACL sought and the Court later approved, an *ad interim* stipulation for ACL's interest in the MEL OLIVER in the amount of $780,000, as secured by the LOU issued by National Liability in the same amount. (Civil Action No. 08-4600, Rec. Docs. 1 at 6, 2 at 1-4, 1-1 at 4-5, & 5 at 2-5). As discussed above, this Court previously ruled that DRD (the demise charterer) was liable *in personam* and the MEL OLIVER *in rem* for the full extent of damages. (Rec. Docs. No. 1435 at 29-30, 1436). ACL, however, was free from *in personam* liability. In its opposition to the Tintomara Interests' motion for summary judgment, ACL argues that its exoneration from liability renders the Tintomara Interests' *in rem* judgment against the MEL OLIVER unenforceable against the LOU furnished by National Liability. For the reasons that follow, this position misses the mark considerably.

### *Enforceability as a Matter of Law*

Decisions under the Limitation Act have "given the statute a very broad and equitable construction for the purpose of carrying out its purpose, and for facilitating a settlement of the whole controversy over such losses as are comprehended within it." *Hartford Acc. & Indem. Co. of Hartford v. Southern Pac. Co.*, 273 U.S. at 217. Indeed, the application of the Limitation Act has been referred to "as the administration of equity in an admiralty court." *Id.* at 217. The limitation proceeding "looks to a complete and just disposition of a many-cornered controversy, and is applicable to proceedings in rem against the ship, as well as to proceedings in personam against the owner." *Id.* at 216. Under the Act, the Court may "enter judgment in personam against the owner as well as judgment in rem against the res, *or the substituted fund*" and distribute the funds according to its right to "marshal all claims . . and to give effect to them by apportionment of the res." *Id.* at 215, 217 (emphasis added).

Before the Court is the situation where the vessel owner has been exonerated from liability, while the vessel itself has been found liable *in rem* and the demise charterer liable *in personam*. Despite ACL's contentions to the contrary, the substitution for the vessel in its limitation action for the LOU furnished by National Liability does not serve to depart from the outcome that would have occurred had there been no substitution in the first place. As examined more fully above, the LOU operates as a substitute *res*, in

place of the vessel, against which the Court's judgment is enforceable to the same extent that it would be were the vessel actually in the custody of the Court or a designated trustee. To this end, it is clear that in the absence of any substituted fund, upon the Court's entry of judgment against the MEL OLIVER, *in rem*, the practical consequence would be the Tintomara Interests' entitlement to seizure and sale of the MEL OLIVER.[16] This would obviously operate to the financial detriment of ACL, despite that entity's theoretical exoneration from liability. This, however unfortunate, is a symptom of reality that cannot be overcome by the legal fiction of a personified vessel distinct from its owner for purposes of liability. There is no practical distinction between the foregoing scenario and one in which the owner has substituted the vessel itself for posted security. Indeed, in such circumstances, the owner receives the benefit of freeing the vessel to return to commerce during the pendency of the action. To allow the posting of security in place of the vessel to afford the owner this boon while depriving a claimant of rights to which he would otherwise be entitled had the vessel remained in the Court's

---

[16] See, e.g., Schoenbaum, *supra* note 6, at § 9-1 ("This view—the personification of the vessel and the idea that there can be *in rem* liability without implicating the vessel owner—is reinforced by two well-known and fascinating cases: *The China*, holding a vessel could be liable *in rem* for a collision caused by the act of compulsory pilot, and *The Barnstable*, stating that a vessel is liable *in rem* for damages done by it while in control of a charterer. In both cases, the shipowner was absolved from *in personam* liability. . . . Their continued validity is recognition of the fact that limited liability (*in rem*) may still be appropriate when the breach of duty is committed by a third party in control of the vessel without the fault of the owner.")

custody is not an outcome that is tolerated in equity or policy. To sanction such a result would remove claimants' incentives to consent to the substitution of security in place of the vessel and would thereby hinder the goals of commercial efficiency that have been the concern of the limitation action from the outset.

Despite the tinge of paradox inherent in absolving the vessel owner of liability while concurrently enforcing judgment against his assets, the owner's recourse, and what ACL fully overlooks in its argument, is to seek indemnity from the demise charterer who caused the vessel to incur liability in the first instance.[17] The fact that, in the present case, that charterer is insolvent may be unfortunate but does not serve to derogate from the straightforward application and operation of law discussed above.

### The Terms of the Letter of Undertaking

In its opposition, ACL further attempts to confuse the issues by arguing that the terms of the letter of undertaking fail to

---

[17]

See Schoenbaum, *supra* note 6, at § 11-4 ("The charterer . . . has an obligation to indemnify the vessel owner if the damage was incurred through the charterer's negligence or fault.") Indeed, the supposed unfairness posited by ACL under these circumstances is no more galling than the scenario presented when the *in rem* liability follows the vessel into the hands of a good faith third party purchaser of the vessel; a situation in which the judgment is nevertheless generally enforceable. *See*, *e.g., Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 37, 80 S. Ct. 1470, 1480, 4 L. Ed. 2d 1540 (1960) ("[T]he absence of liability of the owner of a vessel does not necessarily exonerate the vessel itself. If, for example, a vessel under bareboat charter damages another as the result of the negligence of her crew, the vessel is liable in rem even though an action in personam would not lie against her owner. Likewise, the right of one damaged by the wrong of a vessel to proceed against her follows her into the hands of an innocent purchaser, although the latter is not liable in personam.")

cover the present scenario. (See Rec. Doc. 1547 at 10). The cited
provisions read as follows:

> For [ACL] to file an action for exoneration from or
> limitation of liability pursuant to the [Limitation Act]
> . . . the undersigned, [National Liability], hereby
> agrees to the following undertaking:
>
> 1. To cause to be filed an action by [ACL], as owner
> of the M/V MEL OLIVER, seeking exoneration from or
> limitation of liability in the United States District
> Court for the Eastern District of Louisiana, New Orleans
> Division.
>
> 2. In the event a final decree (after appeal, if
> any) may be entered in favor of any claimant in the
> action described in paragraph 1, then the undersigned
> party agrees to pay and satisfy up to . . . the sum of
> [$780,000].

(Rec. Doc. 1-1 at 4-5).

Based on these provisions, ACL argues that the LOU was furnished
only to cover an action against ACL in its capacity "as owner of
the M/V MEL OLIVER" (i.e., *in personam*). It further argues that the
exoneration of ACL from *in personam* liability in its limitation
action, therefore, means that there can be no judgment "rendered in
favor of any claimant in the action described in paragraph 1,"
because the action described in paragraph 1 relates only to the *in
personam* limitation action of ACL. (Rec. Doc. 1547 at 10). This
argument fails in two respects.

First, the language ACL cites is not supportive of its
contention on this issue. To be sure, the action referred to in the
first paragraph is indeed ACL's limitation action brought as owner

of the M/V MEL OLIVER. However, a limitation action necessarily extends both to the *in personam* liability of the owner as well as the *in rem* liability of the ship.[18] The mere fact that the LOU refers to ACL "as the owner of the M/V MEL OLIVER" is insufficient to constrain the action referred to in paragraph 1 to the point of excluding an *in rem* judgment against the M/V MEL OLIVER.[19] This conclusion is further supported by the language of ACL's original petition for limitation, which states: ". . . Petitioner shows that in the event *it or the M/V MEL OLIVER* should be held responsible to any party by reason of the matters set forth above, Petitioner claims the benefit of the limitation of liability provided in [the Limitation Act]." (Civil Action No. 08-4600, Rec. Doc. No. 1 at 5, ¶ 13)(emphasis added). Thus, "the action" referred to in paragraph 2 is the limitation action extending both to the *in personam* liability of ACL and the *in rem* liability of the MEL OLIVER; the present claim is covered by the terms of the LOU itself.

Second, ACL has entirely overlooked paragraph 3 of the LOU which states: "This letter is to be binding whether the M/V MEL

---

[18] *Hartford Accident & Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927).

[19]
Taken to its logical conclusion, ACL's argument is effectively that the posting of the LOU as security in its limitation action had the effect of converting an action extending *in rem* and *in personam* to one only covering a judgment *in personam*. This argument has previously been considered and rejected by the Supreme Court. *See Cont'l Grain Co., supra*, 364 U.S. at 37 ("Inasmuch as the parties agreed that the letter involved here was to have precisely the same effect as a bond, it follows that the letter is, just as a bond would have been, a substitute for the vessel in the custody of the court, and that the giving and accepting of the letter did not convert the in rem action into one in personam.)

OLIVER is lost or not lost, in port or not in port, and *is given without prejudice to all rights or defenses which ACL or others at interest may have, none of which is to be regarded as waived*." (Rec. Doc. 1-1 at 5). In *Continental Grain Co.*, 364 U.S. at 29, a letter of undertaking including this species of "no-waiver of rights" clause was found to amount to a substitute *res* in place of the vessel. *See also*, Schoenbaum, *supra* note 6 at § 21-3, n.22. Granted, the clause at issue in that case contained express language to the effect that "the rights of the claimant-respondent [were] precisely the same as they would have been had the vessel been taken into custody." *Id*. Nonetheless, there is no question that to deprive the Tintomara Interests in this instance of the opportunity to enforce an *in rem* judgment against the LOU (when they otherwise would have been so entitled were the vessel whose freedom that letter secured in the custody of the Court) would be to "prejudice a right" of the Tintomara Interests in direct contravention of the language of paragraph 3 of that instrument.[20]

---

[20]

Compare the situation in *Petroleos Mexicanos Refinacion v. M/T King A*, 554 F.3d 99, 107 (3d Cir. 2009), wherein the LOU's terms caused it to amount only to a partial substitution of the *res* by reserving the right to later arrest the vessel:

> This is a unique situation. Usually, LOUs serve as a complete substitute for the *res* and therefore contain "non-waiver of rights" clauses preventing hte holder of the LOU from later arresting the vessel and providing that the holder's rights shall be 'precisely the same as they would have been had the vessel, in fact, been taken into custody . . . Under the unique set of circumstances here, however, Pemex retained the right to later arrest the vessel should its claim exceed the amount of the First Lou. The First LOU, therefore, was only a partial substitute for the *res* and it

Finally, it should be noted that the position taken by ACL on this issue is a dangerous one in light of the "long history of trust in the shipping industry concerning the wording of forms commonly used by marine insurance companies." Michael Marks Cohen, *Restoring the Luster to the P&I Letter of Undertaking*, 42 J. Mar. L. & Com. 255, 260-61 (2011). In a prior era, maritime insurers took a very long time to issue marine insurance policies, often waiting until well after an insured event to issue a policy, with entire lawsuits proceeding on the basis of a broker's cover note and neither the parties nor the court even sighting the actual policy until the conclusion of litigation. *See id.* In order that the expectations of the parties not be frustrated by eventual discrepancies between the cover notes and ultimately-issued policies, parties relied upon an atmosphere of trust wherein it was rare for one party to attempt to deny coverage that was previously contemplated based on formalistic arguments relating to the terms of marine policies. "This climate of trust was extended to LOUs. So it was not unusual, when an LOU was offered by a club, that often the first time the plaintiff's lawyer would see the wording would be when he was given the signed document by the club's lawyer." *Id.* The advantage provided by this trust is to prevent the parties and courts from becoming waylaid at the outset litigating which particular aspects of liability or events are to be covered by the

---

contractually guaranteed the right to later arrest the vessel.

relevant instrument before the liabilities of the various parties have been determined. It is also the basis upon which a court is willing to accept approved security in return for the expedient release of a vessel that would otherwise be subject to attachment in a limitation action. In this light:

> The LOU is an unusually creative and valuable document: it is cheap and mutually advantageous since it can be quickly provided anywhere, as well as easily adapted to even the most unusual circumstances, in connection with a threatened or actual ship arrest. But the extraordinary usefulness of the LOU to the shipping industry can be impaired by efforts to reduce the obligations the clubs assume when issuing them. The high regard originally accorded to LOUs should be carefully protected. *This can be accomplished only if the security which the clubs offer in an LOU is 'as substantial, risk free and available as either the arrested vessel tied to the dock and ready for execution, or a bail bond.'"*

*Id.* (emphasis added).

It is clear that if this Court accepts ACL's contention that the LOU furnished here, rather than merely standing in place of the subject vessel as a *res*, is an instrument whose terms serve to materially constrain the potential liability of the underwriter, the utility and efficiency that are the very raison d'être of that device in the admiralty context will be subverted. There will no longer be sufficient incentive for claimants to accept substitute security, litigation costs will increase, and the free flow of commerce will be hindered.

*Pro-Rata Distribution*

ACL's final argument is that if the Court finds the *in rem* judgment against the MEL OLIVER enforceable against the LOU, then the Court must order a pro-rata distribution of the funds secured to ACL and to the Tintomara Interests. (See Rec. Doc. 1547 at 11). ACL cites literally no law in support of this contention and the Court further reads its equitable authority in the context of a limitation action as sufficiently broad to not require such a result.[21] The Court takes judicial notice of ACL's concurrently pending motion to disburse funds from DRD's liability insurer's interpleader action (Rec. Doc. 1545) and the fact that entering summary judgment in favor of the Tintomara Interests in the present action will effectively leave ACL as the sole claimant to those interpleader funds. Thus, any opposition by the Tintomara Interests to the disbursement of funds to ACL from the interpleader action will have become moot.

In accordance with the foregoing, **IT IS ORDERED** that the Tintomara Interests' Motion for Summary Judgment is **GRANTED** (Rec.

---

[21] Schoenbaum, *supra* note 6, at § 15-9 ("The district court judge, sitting as a court of equity, has a great deal of discretion in tailoring the distribution of the fund to fit the circumstances of the case. . . . If some of the claimants are able to satisfy their claims from a source outside the limitation fund, the court, under the doctrine of marshalling assets, may properly refuse to decree a pro rata distribution of the fund and require those claimants to look outside the fund for recovery . . . .")

Doc. 1542) and judgment be entered in favor of the same and against National Liability in the amount of $387,215.41, plus costs and and interest.

**IT IS FURTHER ORDERED** that ACL's Motion for Disbursement of Funds (Rec. Doc. 1545) is **DENIED without prejudice to reurge** as an ex parte motion with certification that no other claimants oppose disbursement of the funds it seeks, especially following above findings.

New Orleans, Louisiana, this 25th day of September, 2014.

_____
UNITED STATES DISTRICT JUDGE